ARMANDO GARRIDO and TERESA GARRIDO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Garrido v. Commissioner
Docket No. 4964-71.
United States Tax Court
T.C. Memo 1973-143; 1973 Tax Ct. Memo LEXIS 145; 32 T.C.M. (CCH) 688; T.C.M. (RIA) 73143; June 28, 1973, Filed. Stuart A. Markus, for the petitioners. Paul R. Stanton, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $797.84 in petitioners' 1967 income tax. The only question is whether petitioners elected to treat a Cuban expropriation loss suffered in 1961 pursuant to the provisions of sections 172(b) (1) (D) and 1972(b) (3) (C) (iii). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Armando and Teresa Garrido, *147 husband and wife, resided in Miami, Florida, at the time they filed their petition herein. Their income tax returns for 1957 through 1967 (both original and amended) were filed with the district director of internal revenue, Jacksonville, Florida. Teresa Garrido is a party herein solely because she filed a joint return with Armando (hereinafter referred to as petitioner) for the year in question. Petitioner became a resident alien of the United States on August 7, 1955 and a citizen thereof in December of 1960. In 1957, he became a 50-percent owner of Circuito Teatral Garrido, a chain of three motion picture theaters located in Cuba. This property was arbitrarily confiscated by the government of Cuba in 1961. No payment or indemnification was ever received by or promised to petitioner by the Cuban authorities. Petitioner's basis in his 50-percent interest in Circuito Teatral Garrido at the time of its confiscation 3 by the government of Cuba was $115,000, and the fair market value at the time of confiscation during 1961 was at least this amount. Petitioners' 1961 return reflected adjusted gross income of $5,913.08. Their original return for 1962 showed taxable income *148 before exemptions of $9,100.38 and a total tax liability of $998.08. On or about February 7, 1964, petitioners filed an amended return for 1962, which reflected an additional $500 loss on account of certain stock becoming worthless in 1962, resulting in a claim for refund in the amount of $110. Petitioners' 1963 return reflected a deduction of $5,973.80, with the following explanation: This is a deduction for confiscation of real property on June, 1963, consisting of three theater buildings, 50% of which was owned by Armando Garrido; operating as Circuito Teatral Garrido in Camaguey, Cuba, and which one-half interest was worth $115,000.00. Petitioners' 1964, 1965, 1966, and 1967 returns each contained a similar claimed deduction with an identical explanation, the amount of the deduction varying in order to produce zero taxable income for those years. 4 No other document purporting to be an election under section 172(b) (3) (C) (iii) was ever filed by the petitioners. While petitioners' refund claim for 1962 was pending, petitioner had several conversations with his lawyer concerning the 10-year carryforward provisions of section 172(b) (1) (D); the lawyer told him *149 he would look into it for him and obtain the maximum benefit possible under the statute. Subsequently, on February 15, 1965, petitioner spoke to an Internal Revenue Agent concerning this confiscation loss. Subsequent to December 31, 1965, petitioner and/or his attorney had several conferences with another Internal Revenue Service employee, and, as a result of these conferences and an audit of petitioners' returns for 1961 through 1965, on or about May 25, 1967, refunds of $336.62 for 1961 and $998.08 for 1962 were allowed to petitioners on account of the confiscation loss then believed to have occurred in 1963, [2] plus the aforementioned worthless stock loss suffered in 1962. The refunds were paid to petitioners. *150 5 OPINION Section 172(b) (1) (A) (i) and section 172(b) (1) (B) provide that a net operating loss shall be carried back 3 years and forward 5 years except in certain circumstances. One of those circumstances is spelled out in section 172(b) (1) (D), which provides that a foreign expropriation loss may be carried forward 10 years, and a Cuban expropriation loss may be carried forward 15 years, [3] without the benefit of any carryback. Section 172(b) (3) (C) (iii) provides that a taxpayer suffering a loss in a taxable year ending after December 31, 1958 and before January 1, 1964, and who is desirous of having his loss carried forward pursuant to section 172(b) (2) (D), must elect to do so on or before December 31, 1965 "in such manner as the Secretary or his delegate by regulation prescribes." On or about April 2, 1964, respondent filed temporary regulations implementing this provision. Section 19.1-1(b) (2) and (3) of these regulations (now section 1.172-11(c) (2) and (3) Income Tax Regs.) 6 required an electing taxpayer *151 to file a statement containing, in part, a declaration that he elects to have section 172(b) (1) (D) apply. Petitioner does not question the validity of respondent's regulations. Instead, he argues that petitioner's taking of the deduction in his 1967 return constituted an "election" because it was only reasonable that petitioner should opt for the greatest number of years of deduction. What petitioner is in essence asking us to do is to pass special legislation on his behalf. Clearly, petitioner's actions with respect to his 1967 return cannot amount to an election since the statute requires the election to have been made on or before December 31, 1965. Looking at the language pertaining to the loss in petitioners' 1963 and 1964 returns, [4] likewise we cannot find any indication of an election to have section 172(b) (1) (D) apply. That language merely reflects the year in which the loss occurred, petitioners' basis therein, and the amount of the loss to be deducted in that year; it does not even contain 7 a computation of the available loss for any particular year. Moreover, considering petitioner's belief prior to trial that the Cuban loss occurred in 1963 and his *152 claim for refund on account of a carryback of that loss and a loss from worthless stock n5 to 1961 and 1962, the evidence would seem to indicate a desire that section 172(b) (1) (D) not apply. Petitioner chose a course of action which caused the normal carryback and carryforward provisions to apply and was allowed and received refunds for 1961 and 1962 on that basis.The fact that he later realized that he would have been better off with the special carryforward benefit cannot be automatically transmuted into an election to that effect. That he may have erroneously, and to his detriment, relied upon the advice and guidance of an attorney cannot salvage his position under the circumstances of this case. Inasmuch as 1967 is the sixth year following the year of loss and in the absence of the aforementioned election, the provisions of section 172(b) (1) (B) apply, respondent's disallowance of a net operating loss deduction for 1967 was proper. Decision will be entered for the respondent. Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. ↩
2. Petitioner and the Internal Revenue Service apparently proceeded on the theory that, inasmuch as petitioner's father, who owned the other 50-percent interest in the Cuban property in question, did not leave Cuba until 1963, the loss did not occur until that time. Apparently, petitioner, in an unsuccessful attempt to avoid confiscation of the property before that time, had "nominated" his father to hold the property for him until he (petitioner) returned to Cuba. ↩
3. The longer period for Cuban expropriation losses was added to the statute in 1971. See section 2(a), Pub. L. 91-677, 84 Stat. 2061 (1971). ↩
4. Petitioners' 1965 return was filed in April of 1966. n5 Petitioners' claim that the carryback related to other losses is belied by the record. ↩